# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re: ) | Chapter 12 |
| ) | Case No. 12-07535-dd |
| Gerald Richard Wise ) | |
| ) | ORDER CONFIRMING |
| Debtor. ) | CHAPTER 12 PLAN |
| ) | |

THIS MATTER is before the Court on confirmation of Debtor's May 16, 2013 modified chapter 12 plan filed pursuant to 11 U.S.C. §§ 1221, 1223[1]. First Reliance Bank (Bank) objects to confirmation[2]. The chapter 12 trustee and the Estate of Agnes Bridgers (Bridgers Estate) support confirmation. The principal issues are the term and interest rate proposed by Debtor for the purpose of § 1225(a)(5)(B) and feasibility. The other objections raised are variously described by the parties as minor or technical. Debtor has conceded the latter objections and agrees to file an amended plan that can be confirmed without further hearing in the event the Court rules with Debtor on cram-down and feasibility.

## FINDINGS OF FACT

Debtor filed his chapter 12 petition on December 5, 2012. The United States trustee appointed J. Kershaw Spong trustee and the employment of Reid B. Smith as counsel for Debtor was approved by the Court. The administration of the case has proceeded in a routine fashion. Debtor proposed a plan on March 5, 2013 and a pre-confirmation conference was scheduled. SC LBR 2082-1(d). Bank noted its objection to the plan and the first scheduled confirmation hearing was continued upon agreement of the parties in order to afford Debtor an opportunity to pursue a possible sale of a portion of the farm land. The sale did not come

---

[1] Further reference to 11 U.S.C. § 101 *et. seq.* (the Bankruptcy Code) will be by section number only.

[2] Bank's objection was filed to a previous version of the plan and continues as to the modified plan.

to pass and Debtor filed his modified plan prior to the May 23 confirmation hearing. Debtor has, with court permission, employed a real estate agent to continue efforts to sell some part of the farm acreage as provided in the modified plan.

The parties agree that the May 16 modified plan is properly before the Court for consideration of confirmation and that Bank's objection to the March 5 plan continues in force. The modified plan proposes five (5) annual payments to the chapter 12 trustee in the amount of $163,391.03 and continued efforts to market and sell a portion of the farm land. Bank's secured claim in the amount of $1,221,616.81[3] is to be paid in fifteen (15) annual installments with 5.75% interest and Bank is to retain its lien[4]. The only other claim in the case is the originally disputed unsecured claim of the Bridgers Estate which the parties agree will be allowed in the amount of $112,318.00. The claim is to be paid in full with interest in five annual installments and Debtor is relinquishing all claims he may have in and against the probate estate.

Bank's claim arises from a September, 2008 loan that consolidated some existing debt and advanced new money for the speculative purchase of real property that Debtor sought to buy and resell at a profit. The loan was made for a short term (initially a two month bridge loan while appraisals were obtained and then for a term of one year) and was to be repaid from efforts to market the real estate and from the sale of older farm equipment. The loan was renewed at least five times, with each renewal for a term of six or fewer months.

---

[3] Debtor has agreed to an upward adjustment of the amount of the secured claim to reflect interest and attorney fees to the effective date of confirmation.

[4] The first five installments will be paid from the plan payment and are to be distributed by the chapter 12 trustee with the remaining payments made directly by Debtor after the case is closed. If any real property is sold the net proceeds from sale will be paid to Bank and the remaining obligation will be re-amortized at the same interest rate over the then remaining repayment term. Debtor agreed that the net proceeds of sale will not be further reduced by any capital gains taxes owed by Debtor and that an amended plan will reflect his concession on this point at the confirmation hearing.

Some interest and principal payments were made at the time of loan renewal and the loan is now in default. Bank initiated foreclosure proceedings against Debtor and the suit had progressed to the point of sale of the real property under lien to Bank.

Debtor has farmed since 1979. He farms in Marion County, South Carolina on land that he owns. The parties agree that the real property is worth more than the debt, perhaps by a factor greater than two. Debtor testified that he owns sufficient farm equipment for the purposes of consummating his plan and he described the equipment as being in good working order. Debtor testified and supported his plea for confirmation with his past two tax returns, a written 2013 farm plan, and a feasibility analysis. Debtor testified that he owns 400 acres of tillable land. He has opened 500 acres of newly tillable land that is available for planting this year and for which Debtor claims to have a lease agreement that will generate new income.[5] Debtor's farm plan for 2013 is for 226 acres of wheat and soybeans and 140 acres of corn. The wheat, in the ground and nearing harvest, is projected to meet or exceed the estimated yield at a cost less than predicted. Debtor testified that the corn is planted and looks good, knee to waist high at the time. Soybeans or grain sorghum are to follow the wheat. The farm plan is consistent with yield and expenses in average years but does not reflect either the highest of yields or times of disaster.

Debtor's feasibility analysis projects total income, after crop expenses, of $251,541.84, derived from rental properties, land installment sales, the spouse's off farm income, farm program and FSA Supplemental Revenue Assistance Payments (SURE), farming, rental of acreage, and custom machine work for other farmers. Bank attacks the feasibility analysis

---

[5] Debtor's Schedules reflect that he owns approximately 947 acres under lien to Bank, another 505 acres that the schedules reflect as lien free, and some 20 lots – some of which are subject to sales contracts. Testimony at the confirmation hearing was confusing as to the extent of the Bank's collateral – which may include as much as 1300 acres. The Court makes no finding as to the extent of the collateral. As provided in the plan, Bank retains its lien on whatever collateral it has.

on three grounds: under-estimating living expenses, overstating farm income and program payments (or at least not taking into account the likelihood of some "bad" years over the next fifteen years), and reliance on income from land rent from other farmers and custom work that is wholly new to Debtor or is far in excess of historical income. With the projections made by Debtor there is money available to make the plan payment, $34,611.96 for living expenses, money for real property taxes with $46,000 or so available as a cash reserve for future operating expenses. Debtor's Schedule J expenses are annualized to approximately $52,614.

Debtor's past two tax returns generally support the projected net crop income, disaster and program payments contained in the feasibility analysis once equipment depreciation and mortgage interest paid Bank are backed out. Bank's own analysis, which incorporates four additional years of tax return and financial information (2006 – 2009), paints a more dismal picture with no cash available to pay living expenses in four of the six years and none projected for 2013. Bank's analysis includes two years of financial information that pre-dates its 2008 loan to Debtor. Interestingly, the data from these two years reflect the worst farm losses and negatively impact Bank's ongoing projections.

Debtor's testimony concerning the new sources of income from renting the newly cleared crop land to another farmer and for custom work was the only evidence available as to these sources of income other than Bank's officer's un-objected to opinion that past performance is the most reliable indicator of future financial results. Debtor testified that the crop land is cleared and that he has a verbal agreement to lease 400 - 450 acres of land at $100 per acre for the current crop year. Debtor has not previously leased this land but it was not cleared and available for that purpose until now. Debtor also testified that he would have

significantly greater income from custom machine hire as a result of the needs of the tenant on the new acreage for the use of rental farm equipment on that tract and on other tracts that tenant is renting from other farmers in the area. Debtor previously reported income of $20,000 for machinery hire, thus this in not an altogether new source of income for debtor but is a significant increase.

## CONCLUSIONS OF LAW

A chapter 12 plan must be confirmed by the court if it meets the requirements set forth in §1225. The issues *sub judice* are whether the plan proposed by Debtor is feasible and whether it treats Bank, the sole secured creditor, in one of three permissible ways. Trustee and the lone unsecured creditor recommend confirmation.

Chapter 12 balances the Congressional policy of preserving and fostering American family farms with the rights of creditors to payment. Chapter 12, a part of the Bankruptcy Code since 1986, is a hybrid provision that resembles a chapter 13 debt adjustment, though with provisions that address issues unique to the family farmer. Since chapter 12 incorporates provisions from other parts of the Bankruptcy Code, resort to the case law interpreting similar provisions in other chapters is often helpful. Such is the case with the two issues at hand.

The feasibility test of chapter 12, similar to that of both chapters 11 and 13, requires the court to ascertain the ability of the debtor to make the payments called for by the plan and to otherwise comply with the plan. This determination is made in light of projections of income and expenses, just as with the sister chapters. The evidence presented at confirmation by Debtor and Bank comes in part from Debtor's records in the form of tax returns, and is supplemented by Schedules I and J and by projections based on changes or additions to the

historical operation. This analysis is more akin to that undertaken in chapter 11 cases than that for routine wage earner adjustments.

Bankruptcy Courts wrestle with feasibility in debt adjustment and reorganization cases; perhaps nowhere more so than in farm cases. "Feasibility is never certain, particularly in farm situations. It is an element of confirmation that is difficult to prove, equally difficult to decide." *Matter of Bluridg Farms, Inc.*, 93 B.R. 648, 656 (Bankr. D. S.D. Iowa 1988) *citing In re Kloberdanz*, 83 B.R. 767, 773 (Bankr. D. Colo. 1988). At the same time, "[i]t is not necessary for debtors to 'guarantee the ultimate success of their plan, but only to provide a reasonable assurance that the plan can be effectuated.'" *In re Howard*, 212 B.R. 864, 879 (Bankr. E.D. Tenn 1997)(citations omitted). Courts sometimes give family farm debtors the benefit of the doubt on the issue of feasibility. One court in our circuit recognized "…the simple fact is that family farming is not an exact science; the success or failure of any one farm is largely dependent upon luck and upon the farmer's skill, resourcefulness, spirit, and grit. No one knows with any real certainty what tomorrow will bring. Many perils face family farmers: Recessions, depressions, droughts, hail storms, and even locusts. In the face of such possible perils, certainly it is not error for a court to consider, along with the hard numbers, the human factor, which may be the deciding factor when fortune – or nature – works against the efforts of the farmer." *In re Rape*, 104 B.R. 741, 751 (W.D. N.C. 1989). The "hard numbers" included consideration of "the farm's earning power, capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the farm." *Kloberdanz* at 773 (citations omitted).

The Debtor's projections support a finding that the plan is feasible. The farming income (including program and disaster payments) and expenses are consistent with

historical figures. Debtor projects new sources of income that are not merely speculative but rest on the present development of assets that could not previously be used in the then raw condition and the present agreement to provide custom machine hire to a new tenant. While the projected living expenses set forth in the feasibility analysis are less than those projected in Schedule J, the available cash reserve serves as a partial buffer and Debtor testified that he can live within the budget as projected for feasibility purposes.

Debtor has extensive assets that serve to protect Bank and any deficiency it may have with respect to the collateral it has under lien. This softens the short term risk of non-payment. The combination of real and personal assets provides Debtor with a foundation for rehabilitation of the farming operation. As both parties acknowledge, the local and national economy is improving, making more likely the chance that Debtor will finally realize on his speculative purchase of real property. Debtor proposes to remain in possession and to engage in farming over the life of the plan and the repayment term for Bank's debt while disposing of assets that will pay down the Bank more quickly. Debtor is enrolled in farm programs and has crop disaster insurance, as was previously his practice and as he testified he will continue to do. Debtor, a thirty plus year veteran of farming, certainly exhibits the fortitude to continue farming.

Having found the plan feasible, the Court turns to the plan treatment of Bank's fully secured claim. Bank objects to both the term of repayment and the interest rate. As previously noted Debtor agrees that Bank is over-secured and has agreed to capitalize the post-petition contract interest, costs and fees along with the pre-petition balance due.  The question then is whether Debtor may stretch out repayment of what concededly was a short

term obligation and remain true to principles of equity and fairness. The Court concludes that the plan provides the proper balance and should be confirmed.

Bank relies heavily on *In re Koch*, 131 B.R. 128 (Bankr. N.D. Iowa, 1991) which it cites for the proposition "that the duration of repayment proposed for a secured claim under a plan of reorganization must be in line with customary lending practices or market standards to satisfy § 1225(a)(5)(B)(ii)." *Id*. at 132. Bank's witness testified that there is no market for loans of the type proposed here and that underwriting requirements, if extrapolated to fit these circumstances, would require an amortization with a near term balloon payment and a higher interest rate. The witness testified that the balloon payment would be required at 60 months at the latest and that an interest rate of between 6.25% and 8% would be required.

The cram-down provisions of §§ 1129(b)(2)(A)(i), 1225(a)(5)(B), and 1325(a)(5)(B)(i),(ii) are similar. In interpreting these sections courts have adopted either a mathematical calculation requirement for meeting present value or a market approach. *See cases collected Id*. at 131-2. This leads back to the first question:  the term of the amortization. The cases debating the propriety of stretching out a loan are ably collected elsewhere. See 8 *Collier on Bankruptcy* ¶ 1225.03[4][b][i] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010)[hereinafter *Collier*]. This Court has often confirmed plans involving the repayment of debt secured by real property over terms of twenty (20) or even thirty (30) years. Debtor proposes a fifteen (15) year repayment term.

While it may often be necessary or equitable to moderate the mathematical calculation approach with economic considerations from the market, this Court generally follows those courts that employ an objective determination of value. "'Value' must be determined objectively. Simply because a creditor subjectively would not extend a mortgage

on the same terms does not mean that objectively the mortgage does not have a given value." *Travelers Inc. Co. v Bullington*, 878 F2d 354, 358 (11th Cir. 1989). Beginning with the proposition that loans for farm land are often extended for twenty or more years, a term of fifteen years is not excessive under these circumstances. While the loan was originally for a one year term, the preservation of Debtor's farming operation requires a more lengthy term. Bank is protected by both what is essentially a due on sale clause in the plan and by an undisputed cushion of equity above the lien. The term proposed by Debtor is satisfactory and meets the requirements of the Code.

Likewise, the Court finds that the interest rate proposed by Debtor is sufficient to survive the objection of Bank. The parties agreed and the Court judicially notices that the Wall Street Journal prime rate is 3.25%. Debtor proposes an interest rate that includes a risk factor of 2.5. Bank proposes its own prime rate of 4.25% and a risk factor of 2 or a market rate of 8%. To find the present value of the deferred cash payments the Court must apply a discount factor to the stream of payments by setting an interest rate to be added to the allowed amount of Bank's claim. The Supreme Court's decision in *Till v SCS Credit Corp.*, 541 U.S. 465 (2004), while involving a security interest in a vehicle in the context of a chapter 13 case, supplies the appropriate methodology for determining the interest rate component of present value. *Till* suggests a risk factor of between 1 and 3 points above prime with a rate "high enough to compensate the creditor for its risk, but not so high as to doom the bankruptcy plan." *Id*. at 480. Debtor's interest rate of WSJ prime plus 2.5 compensates Bank for its risk and does not impair Debtor's chance for rehabilitation. In fact, given the margin of equity in Bank's collateral, the risk factor proposed by Debtor is on the high side.

CONCLUSION

Bank's objections to confirmation are overruled. Debtor shall, within ten (10) days, file a further amended plan changing the provisions concerning capital gains taxes and payment of the net proceeds from sale to Bank; noting that the automatic stay – while remaining in place for the duration of the plan term – may be modified pursuant to § 362(d) on motion of a party in interest; providing for § 1206 sales of sufficient real property and farm equipment by the chapter 12 trustee during the term of the plan in the event of defaults in payment in order to pay Bank and the Bridgers Estate in full; providing for the payment of net proceeds of sale to Bank from any continued marketing of real property by debtor and the real estate agent employed by the estate; providing interest of 5.25% to the Bridgers Estate; and capitalizing Bank's post-petition interest, fees and costs to the effective date of confirmation. The modified plan as further amended will be confirmed by the Court without further notice or hearing.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**05/31/2013**



David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina

Entered: 06/03/2013